IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FAUSTINO AYALA,                          No. C 10-4375 TEH (PR)

          Petitioner,

     v.                                  ORDER DENYING PETITION FOR WRIT
                                         OF HABEAS CORPUS; DENYING
GREG LEWIS, Warden,                      CERTIFICATE OF APPEALABILITY

          Respondent.

_____/

          Pro se Petitioner Faustino Ayala, a state prisoner
incarcerated at Pelican Bay State Prison, seeks a writ of habeas
corpus under 28 U.S.C. § 2254 to vacate his conviction after a trial
by jury.  For the reasons that follow, the Court denies the
petition.

                              I

          On June 23, 2008, a jury found Petitioner guilty of the
second degree murder of Francisco Rodriguez.  The jury also found
that the murder was committed for the benefit of a criminal street
gang and that Petitioner was a principal in a gang murder committed
by the intentional discharge of a firearm.  1 Clerk's Transcript
(CT) 164-67.  On August 11, 2008, the court sentenced Petitioner to
an indeterminate term of fifteen years to life for the murder, plus

United States District Court
For the Northern District of California

an additional twenty-five years for the gang-related firearm enhancement.  5 CT 1517-18; 1522-23.  The gang participation enhancement was stayed.

Petitioner appealed his conviction and, on February 11, 2010, the court of appeal affirmed the judgment in an opinion certified for partial publication.  People v. Ayala, 181 Cal. App. 4th 1440 (partially certified for publication); People v. Ayala, A122412 (California Court of Appeal, February 11, 2010), Ex. 2.  On May 20, 2010, the California Supreme Court denied review in a one-sentence order.  Exs. 3. and 4.

On September 28, 2010, Petitioner filed the instant habeas petition raising the following claims:  (1) denial of his right to a trial by jury when the trial court improperly removed a "holdout" juror; (2) denial of his right to due process on the ground of insufficient evidence to support his second degree murder conviction; and (3) denial of his right to a jury trial on the gang-related firearm enhancement.[1]  On February 22, 2011, the Court found that these claims were cognizable and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Doc. #3. Respondent has filed an answer; Petitioner has not filed a traverse.

II

The following factual background is taken from the order of the California Court of Appeal.

The Sureños and Norteños are rival street gangs. Petitioner joined the Sureños when he was twelve years old.  In 1997, at the age of thirteen, Petitioner was found guilty of assault

---

[1] As discussed below, Petitioner's third claim is a challenge to an ambiguous jury instruction.

United States District Court
For the Northern District of California

with a deadly weapon when he stabbed someone in the back at school. In 1998, at the age of fourteen, Petitioner was held responsible for attempted murder when he gave a gun to another Sureño to shoot at a car full of Norteños, and Petitioner's accomplice fired four or five shots at the vehicle.  The juvenile court placed Petitioner in the California Youth Authority, where he remained until 2005, when he was twenty years old.  Five months later, he participated in the gang shooting at issue here.

        The gang attack occurred on the afternoon of July 12, 2005, in a Norteño neighborhood.  On that day, Francisco Rodriguez was standing outside his apartment building talking to his brother-in-law and a friend when a blue car drove past.  Rodriguez was a former Norteño gang member, but had left the gang a few years earlier, when he married.  Petitioner was driving the blue car, and it had four or five other Sureño gang members as passengers, including Josue O. and Daniel V., who were both fifteen years old. At age twenty, Petitioner appeared to be the oldest person in the car.

        Josue O. shot and killed Rodriguez.  Rodriguez's brother-in-law, Richard Padilla, described the events at trial.  Padilla testified that a blue car slowly drove past them, then returned at an even slower speed.  A male exited the car from behind the driver's seat, with a Mexican flag bandana covering the lower part of his face, and approached Rodriguez, Padilla, and Rodriguez's friend, Jose Navarret.  The individual approached to within approximately eight feet, then raised his hand in a pointing gesture.  Padilla thought the individual had a weapon and ran.  His companions ran also, but Rodriguez's foot had a malformation that

3

United States District Court
For the Northern District of California

caused him to walk with a "bad limp" and prevented him from running fast.   Padilla heard a gunshot and returned to see Rodriguez on the ground.

Navarret testified that a blue car stopped in the street and a male with his face covered exited the vehicle from the rear seat behind the driver and approached the threesome.   The threesome ran and, seconds later, Navarret heard a gunshot followed by the sound of running, a door slamming, and a car taking off.   He returned to see Rodriguez lying on the ground in a puddle of blood. Rodriguez died from a gunshot to the back of his head.

Petitioner was arrested hours later driving the blue car, with Josue O. and another Sureño in the car.   Josue O. admitted to shooting Rodriguez and said he obtained the gun from a hidden compartment in the car.   A car search found the hidden compartment, which was empty, and a baseball bat and a stabbing shank.

The gun that killed Rodgriguez was recovered later by the police, from a Sureño named Juan O.   Juan O. testified that Daniel V. had telephoned on the afternoon of the shooting and arranged to meet him.   Daniel V. arrived in a blue or gray car driven by Petitioner and accompanied by Josue O.   Daniel V. asked Juan O. to hide two guns and a box of bullets and said that one of the guns had been used by Josue O. to shoot a Norteño.   Juan O. hid the weapons, but a police search the next morning recovered them.   A criminalist testified that one of the guns was used to kill Rodriguez.

Petitioner admitted being the driver of the vehicle used in the shooting, but denied making any plans to kill a Norteño.   In a statement to the police, which was admitted at trial, Petitioner said that, on the morning of the shooting, he had methamphetamine

**4**

United States District Court
For the Northern District of California

for breakfast and was driving the car with five occupants, just cruising around.   Petitioner did not own the car; he had been asked to drive because he looked older than the others.   They passed three men that seemed to be Norteños who were disrespecting them and the car occupants asked Petitioner to drive by the three Norteños again. In his statement, Petitioner said that he knew there "was gonna be some funk," and "some gang related ass shit" when he and his friends returned.   Petitioner said that he thought his friends were "gonna go over there and beat the shit out of the guy."   He knew there was "a bat and shit" in the car, but claimed he did not know anyone had a gun.   Petitioner admitted that everyone in the car except him covered their faces when they returned to confront the threesome. Petitioner said he did not know that anyone was going to shoot.

Petitioner's girlfriend, Aide Chiyona Romero, testified that Josue O., Daniel V. and three other Sureños arrived in a blue car on the afternoon of July 12, 2005, and informed Petitioner that they just had an argument with Norteños, who threw things at the car.   The Sureños told Petitioner they wanted to return for "payback" and asked him to drive because he looked older.

A police officer with expertise in gang behavior testified that, at the time of the shooting, there was a gang war being waged on the city streets between Sureños and Norteños.   Violent attacks by gang members upon rivals were frequent and those attacks often involved shootings.   The expert testified that the "ultimate goal" in gang culture was to kill a rival gang member.

The gang expert also testified that there is a gang hierarchy, with associates at the bottom and an original gangster (OG) on top.   OG status is achieved by those who have been in the

**United States District Court**
For the Northern District of California

gang a long time and have committed violent acts on rival gang members.  The officer said the OG is the "shot caller" on the streets, who directs younger members of the gang.  The gang expert testified that Petitioner was the OG and shot caller in the group that attacked Rodriguez because he was the oldest and the person who had done the most violent acts against rival gang members.  The gang expert also testified that gang members do not cover their faces in most gang attacks because they want notoriety and know that the rival gang victim will not report the attack to the police; however, gang members will cover their faces when there is going to be a shooting because a murder will be reported by citizens and investigated by the police.

The prosecution's case consisted primarily of the testimony summarized above.  The defense did not present any witnesses.  In his closing argument to the jury, the prosecutor argued that Petitioner was guilty of first degree murder because he was the "shot caller" in a group that intended to retaliate against the Norteños by killing one of their members, and was a knowing accomplice in the premeditated shooting.  In the alternate, the prosecutor argued that Petitioner was guilty of second degree murder because he admitted to the police that he intended to commit assault with a deadly weapon, a baseball bat, and the shooting was a natural and probable consequence of the gang assault.

Defense counsel argued that Petitioner never intended to kill anyone because the evidence only showed that he planned to engage in a gang fight, not that he intended to use a dangerous weapon in the attack.  Although Petitioner knew there was a baseball bat in the car, he did not intend to use the bat.

**6**

**United States District Court**
For the Northern District of California

1    On the afternoon of June 16, 2008, the jury began its
2  deliberations.  Approximately one hour after beginning
3  deliberations, the jury submitted a note to the court asking whether
4  drug influence should be considered regarding the defendant's intent
5  to commit the crime.  The court gave an instruction on the relevance
6  of intoxication: "You may consider evidence, if any, of the
7  defendants' voluntary intoxication only in a limited way.  You may
8  consider that evidence only in deciding whether the defendant acted
9  with intent to kill, and whether the defendant acted with
10  deliberation and premeditation, and/or the defendant acted with the
11  intent to aid and abet the commission of a crime."  People v. Ayala,
12  A122412 at 14.

13    On the afternoon of June 17, 2008, the jury wrote to the
14  judge: "'After deliberating half the day, we are at an impasse
15  regarding the effect of drugs' on defendant 'being responsible
16  [] for his actions,' and that the same juror who has concerns about
17  defendant's intoxication 'feels that the assault that was to take
18  place would not have resulted in a deadly outcome.  Since we have
19  not been able to decide whether [defendant] aided or abetted in this
20  crime, we cannot move forward with our deliberations.  Please advise
21  us on what we should do.'"  The court asked for further explanation
22  and the jury wrote:  "We can't reach unanimous agreement that
23  (1) The defendant knew that a deadly weapon was going to be used as
24  part of the retaliation and (2) That, because of the influence of
25  intoxication, he was not a 'reasonable person' to know the probable
26  consequence of assault. . . . We don't think we will overcome this.
27  What do we do next?"  People v. Ayala, A122412 at 15.

28

**7**

**United States District Court**
For the Northern District of California

On the morning of Wednesday, June 18, 2008, the court asked the jurors if additional argument by attorneys concerning voluntary intoxication and its application to the facts would help. The jurors responded that it would be helpful.  Defense counsel objected, noting that he had not presented expert testimony to support an intoxication defense but did not want to have the prosecutor argue the matter unrebutted.  Ultimately, both attorneys argued the matter to the jury.  The prosecutor argued that intoxication was unsupported by the evidence and was not an issue in the case.  He dismissed Petitioner's statement to the police that he was intoxicated on the day of the shooting as a lie and argued that Petitioner's conduct showed conscious and intentional acts.  Defense counsel countered that Petitioner was a long time drug user, was intoxicated on the day of the shooting, and his intoxication was relevant to his ability to premeditate and form specific intent. Jury deliberations resumed.

Late Wednesday morning, the jury wrote a note to the court stating: "We have one juror who feels very strongly that the prosecution did not present a case for murder beyond a reasonable doubt.  This one person will not budge from this position, despite several attempts from all members to change their view.  We have gone 'round and 'round, and are not making progress.  We do not think we can reach agreement on a decision."  People v. Ayala, A122412 at 15-16.

Before the court could give an additional jury instruction on how to conduct deliberations, the jury foreperson sent a note to the court suggesting there had been misconduct by the hold-out juror.  The foreperson wrote:

United States District Court
For the Northern District of California

> I would like to relay to you my concern that
> juror #2 may be influenced by circumstances of
> her background that will not allow her to
> provide adequate explanation as to why she
> cannot follow the law in this case.  During our
> conversations, juror #2 relayed to us that she
> had family members involved in the gang life and
> that she had a relative who was in the witness
> protection program.
>
> I am concerned that there may be some influence
> on her that we cannot be allowed to understand.
>
> We are deadlocked in our deliberations because
> of her actions and inability to articulate her
> position in any detail that would allow us to
> continue to deliberate.  Were you aware of her
> particular situation and open to the possibility
> that there would be outside influence to our
> deliberation?

People v. Ayala, A122412 at 16.

After consulting counsel, the court determined that a hearing was necessary to explore the possibility of juror misconduct. Defense counsel objected and maintained that the jurors should be instructed to continue deliberations or the court should declare a mistrial based on a hung jury.

On the morning of Thursday, June 19, 2008, the court questioned both the jury foreperson and Juror Number 2 under oath.  The court began its inquiry of the foreman by stating, "I want you to be very careful and do not volunteer any information about the determination of guilt or innocence in this case, that's not why you are here. What the court is trying to find out is what the issues are with regard to the deliberations process.  So we're talking about conduct not content."  People v. Ayala, A122412 at 30.  The foreperson testified that he was concerned about Juror Number 2's conduct and that seven other jurors expressed similar concerns to him.  He said that Juror Number 2 claimed familiarity with gangs, drugs, and the

United States District Court

For the Northern District of California

neighborhood where the murder occurred, and interjected her claimed expertise of these matters into deliberations.  The foreperson testified that Juror Number 2 specifically said that someone in her family had been involved with a gang and she had an insight into what gangs were about, that one of her relatives was in the witness protection program and that she was familiar with drugs and their effects on people.  The foreperson also stated that Juror Number 2 claimed familiarity with the street where the shooting occurred, described its layout, and said it was too narrow for Petitioner's stopping the car in the street to "be such a big deal."  The foreperson testified that Juror Number 2 relied on her experiences "as an explanation for her unwillingness to make any decisions that would un-deadlock the jury."  People v. Ayala at 17.

The court decided to question Juror Number 2 about the issues that were at odds with her answers on the questionnaire she filled out as part of the voir dire.  The questionnaire provided an account of the allegations against Petitioner, including the fact that he was accused of murder in a Sureño gang shooting.  On the questionnaire, Juror Number 2 had indicated that she had no knowledge or experience of street gangs, that gang violence had never touched her life or the life of anyone close to her, and that she had never seen or met any individuals she believed were members of a street gang.  Although the questionnaire did not ask about experience with drugs or familiarity with the neighborhood of the crime, it identified the street where the crime occurred and broadly asked if there were any matters that should be brought to the court's attention, to which Juror Number 2 responded, "no."  When questioned on voir dire, Juror  Number 2 said she did not have

10

United States District Court

For the Northern District of California

strong feelings about gangs and, when asked if her ideas about gangs were based on media accounts rather than personal experience, she replied, "pretty much."   People v. Ayala, A122412 at 18.

The court asked Juror Number 2 if, during deliberations, she had said that she had a family member in the gang life.   Juror Number 2 said, "No, I said I knew people from my past.   I mean 25 to 30 years ago but that's nothing that's current."   The court asked what she said about having experience with gang life and Juror Number 2 replied, "That could have been--that could have been my lifestyle but I didn't--don't associate."   The court asked why she did not write anything about her experience with gangs on the questionnaire and she replied that it didn't apply because it was twenty or thirty years ago.

The court asked Juror Number 2 if she said she had a relative in the witness protection program, and she replied that she said only that she "knew people."   When asked about her familiarity with the neighborhood of the shooting, Juror Number 2 said she did not frequent the area, had once "stumbled on to it," and only became familiar with the area by seeing maps in court.   People v. Ayala, A122412 at 19.

After Juror Number 2 was excused, the prosecutor argued that she had lied on the juror questionnaire when she said she had never seen or met anyone she believed to be a member of a street gang and, because familiarity with gangs was a relevant issue, Juror Number 2 should be discharged for misconduct.

The court recalled Juror Number 2 and asked her to explain why she had answered "none" in response to the question which asked if she had any knowledge of, or experience with, street gangs, when

11

United States District Court

For the Northern District of California

she had told the court that she had known people in the gang life.
Juror Number 2 replied: "not this particular . . . people" and that
"it didn't come back to me until after the fact."  The court asked,
"[M]y question would be why didn't you--I appreciate that you may
have forgotten about it when you were filling out the questionnaire,
but why didn't you bring that up?  You clearly knew this was a gang
case, it's all we talked about.  Is there some reason you didn't
bring it up during voir dire?"  Juror Number 2 responded, "It
didn't--didn't feel like it was something that from 25 to 30 years
ago felt that it was. . . . I didn't know per se the gang life, I
just knew of."  The court asked, "Then [the questionnaire] says, . .
. 'have you seen or met any individuals who you believe to be
members of a street gang, please explain,' and you wrote down,
'none.'"  Juror Number Two replied, "no persons that are--what do
they say--what was the words used here, wannabees, that's it.
Nothing, no one that's with tattoos or locked up or anything of that
nature."  The court stated, "Okay.  I'm trying to--I'm having
difficulty reconciling your earlier comment that but for
circumstances you could have been in a gang life with what you're
saying right now."  Juror Number 2 replied, "With the wannabees that
were headed in that direction, if I chose to stick around with them
I'm sure."  The court asked, "Wannabees usually are associated with
people who are actually members, so have you ever in your life met
any members of a gang?"  Juror Number 2 replied, "No."  <u>People v.
Ayala</u>, A122412 at 20.

        The court recalled the foreperson to clarify some of his
statements.  The foreperson said Juror Number 2 had not been
specific about any experience with gangs and only suggested that she

knew about gangs, but that she had been specific about the width of the street where the shooting occurred and that she told the jurors that she had been on a prolonged high on methamphetamine and that a person could not be responsible for their actions when they are in that state.

The court recalled Juror Number 2 who admitted mentioning her experience on methamphetamine but said she was not relating her experience to the evidence.  She said she didn't mention it during voir dire because she didn't think it was important.  The jury questionnaire did not ask about drugs and Juror Number 2 was not asked any questions about drugs during voir dire.

The prosecutor renewed his request to discharge Juror Number 2 and the court recessed to research the matter.  The prosecutor then notified the court that he had several police reports indicating that Juror Number 2 had been the victim of four crimes between 2000 and 2004, even though on the juror questionnaire she had answered no to the question whether she had been the victim of a crime.  In November 2000, Juror Number 2 was the victim of a restraining order violation when the offender paged and sent electronic messages to her.  In August 2001, she was the victim of a sexual battery at work when a grocery store customer grabbed her buttocks.  In May 2004, someone slashed the tire on her car and, in August 2004, she was the victim of a residential burglary.  On each incident report, Juror Number 2 was listed as a witness and her personal contact information was stated, which suggested that she spoke to the police about each incident.  When the court questioned Juror Number 2 about this, she testified that she could not recall any of the crimes except the burglary, which she remembered only

13

United States District Court

For the Northern District of California

when the court asked her about it, and that she did not remember any of the crimes at the time she completed the questionnaire.

The court discharged Juror Number two for misconduct.  The court told counsel,

> I had my doubts about [Juror Number 2's] credibility before this, but I think this is very clear that she simply is not credible.  She is not believable to me that she would be the victim of . . . incidents where she talked to the police and only recalls one maybe, but doesn't recall the others.  It's just simply not believable.  So clearly she made a misconduct when she's filling out the questionnaire.  I think there are other things that indicate on other issues that she was not credible as well, and of course the court was concerned that she was essentially becoming a witness in the jury room, but essentially above and apart from that, she clearly committed misconduct with not answering the questionnaire truthfully, specially with regard to whether she's been the victim of a crime.

People v. Ayala, A122412 at 21-22.

The court replaced Juror Number 2 with an alternate juror and the reconstituted jury resumed deliberations that day, June 19, 2008.  The court recessed for a long weekend and deliberations continued on Monday, June 23, 2008.  That afternoon, the jury returned its verdict, finding Petitioner guilty of second degree murder and that the murder was committed for the benefit of a criminal street gang and that Petitioner was a principal in a gang murder committed by the intentional discharge of a firearm.

### III

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, a federal court may not grant a writ of habeas corpus on any claim adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a

14

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citation omitted). Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and

**United States District Court**
For the Northern District of California

'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, __ U.S. __, 131 S. Ct. 1305, 1307 (2011) (citation omitted).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts. Avila v. Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002). Because the California Supreme Court summarily denied relief on Petitioner's claims, this Court looks to the California Court of Appeal's February 11, 2010 written decision denying Petitioner's appeal.

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.

### IV

### A

Petitioner argues that there was insufficient reason for the trial court to remove the "holdout" juror and, thus, his Sixth Amendment right to an impartial jury was violated.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; Irvin v. Dowd, 366 U.S. 717, 722 (1961). A Sixth Amendment claim may be made on the ground that a juror was substituted without good cause. Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997) (pre-AEDPA case). Because, on habeas review, a trial court's findings regarding juror fitness are entitled to special deference, review is for manifest error. Id. That the trial court knew the excused juror was the sole holdout for acquittal does not in itself invalidate the decision to excuse the juror. Id. at 1427. To establish bias, "a party must first demonstrate that a juror failed

16

United States District Court

For the Northern District of California

to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." Sanders v. Lamarque, 357 F.3d 943, 949 (9th Cir. 2004) (citing McDonough Power Equip. Inc. v. Greenwood, 464 U.S. 548, 556 (1984)). A trial court may exclude for cause any prospective juror who will be unable to render an impartial verdict based on the evidence. Irvin 366 U.S. at 723-24.  A prospective juror must be removed for cause if his views or beliefs would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.   Wainwright v. Witt, 469 U.S. 412, 424 (1985).  The discharge of a juror during deliberations is improper "if the request stems from doubts the juror harbors about sufficiency of the government's evidence ."  Sanders, 357 F.3d at 945.

        When dismissing a juror, the trial court must consider the totality of the circumstances.  Lowenfeld v. Phelps, 484 U.S. 231, 237 (1988).  On habeas review, compliance with Lowenfeld requires "only that the fair import of the Court of Appeal's opinion" is that it considered the totality of the circumstances. Lopez v. Kernan, 444 Fed. Appx. 962, 964 (9th Cir. 2011).

        The state appellate court reviewed the trial court record at length and found that the court's questioning of Juror Number Two supported a finding of bias.  People v. Ayala, A122412 at 24-30. The appellate court stated that Juror Number 2's "intentional concealment during voir dire shows bias and warranted her discharge

1  . . . . Not only did [Juror Number 2] perjure herself on voir dire,

2  but she repeatedly engaged in obfuscation and evasion when the court

3  confronted her with her lies.  These are not the actions of an

4  impartial, fair-minded juror."  Id. at 27.  The appellate court

5  reasoned that

> a finding of bias is supported by more than
> [Juror Number 2's] intentional concealment of
> her experiences as a crime victim.  We must
> consider the case as a whole and determine
> whether the trial court relied on 'evidence
> that, in light of the entire record, supports
> its conclusion that bias was established.'
> Here, [Juror Number 2's] deceit tended to show
> bias because she also concealed her prior gang
> experiences and was evasive when confronted with
> the inconsistencies between her responses to the
> juror questionnaire and later statements to the
> court.  The trial court specifically found that
> [Juror Number 2] was not credible on issues
> apart from her experiences as a crime victim.
> There also was evidence that [Juror Number 2]
> was relying on facts not in evidence. . . .
> Here, no intoxication defense was presented at
> trial, yet [Juror Number 2] introduced her
> personal experience with methamphetamine into
> the deliberations and used that extrinsic
> information to weigh defendant's culpability.
> The trial court was rightly concerned that
> [Juror Number 2] was becoming a witness in the
> jury room.  Under the circumstances as a whole,
> [Juror Number 2] was properly discharged from
> the jury and replaced with an alternate juror.

People v. Ayala, A122412 at 29.

The state appellate court's analysis is thorough, cites

substantial evidence to support its conclusion that Juror Number 2

was biased, and meets the Lowenfeld requirement that it consider the

issue of bias under the totality of the circumstances.

Citing Sanders, 357 F.3d at 944-45, Petitioner argues that the

state court's denial of his claim was unreasonable because the

discharge of Juror Number 2 was prompted by the foreperson's

complaint that, "We have one juror who feels very strongly that the

United States District Court

For the Northern District of California

prosecution did not present a case for murder beyond a reasonable doubt." Petitioner claims that this shows the court improperly dismissed Juror Number 2 because she felt the government's evidence was insufficient.

In Sanders, the court found that the record failed to support the state's argument that the juror dismissed by the trial court was biased. Id. at 949. The court noted that the juror provided responsive and direct answers posed to her by the trial judge, that she was forthcoming with information during voir dire and that there was no evidence that she concealed information or that she harbored bias or prejudice during the deliberation process. Id. The court found it highly significant that the trial court made a preliminary determination that the juror was impartial and objective, and decided to dismiss her only after considering the prosecutor's argument that he would have challenged her if he had known of her life experiences. Id. at 949-50. The Sanders court noted that the prosecutor's failure to discover any relevant information about the juror was due to his own lack of diligence and not to the juror's concealment of information. Id. at 950.

Here, unlike in Sanders, the trial court found that Juror Number 2 was biased because she failed to disclose significant facts about her background on her juror questionnaire. In particular, she failed to disclose that she had been involved with gangs, which was particularly relevant to Petitioner's case. Thus, a correct response would likely have provided a valid basis for a challenge for cause. Furthermore, the trial court found that Juror Number 2 was becoming a witness in the jury room by discussing her knowledge of gang life, her familiarity with the area where the crime was

United States District Court

For the Northern District of California

committed and her experience with methamphetamine.  And, as noted by the appellate court, Juror Number 2's response to the trial court's questions appeared to be evasive and lacking in candor, which also supported the trial court's conclusion that Juror Number 2 was biased.  Further, as noted by the appellate court, before the trial court started questioning the foreperson, it  warned the foreperson not to talk about the content of the deliberations and, thus, took precautions to limit its inquiry to allegations of misconduct. Therefore, the appellate court's conclusion that Juror Number 2 was discharged for good cause was not unreasonable in light of the evidence.

Citing <u>McDonough Power Equipment</u>, 464 U.S. at 556, Petitioner argues that the dismissal of Juror Number 2 violated his Sixth Amendment right to an impartial jury because any disclosure by the juror that she had been the victim of one or more relatively minor crimes would not have justified a challenge for cause. <u>McDonough</u> held that, to obtain a new trial on the basis of juror bias, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."  <u>Id.</u>  However, the Ninth Circuit has identified three theories of juror bias based on a misstatement by a juror during voir dire: (1) <u>McDonough</u>-style bias (i.e., juror fails to answer honestly and, had he answered correctly, the information would have provided a basis for a challenge for cause), (2) "actual bias, which stems from a pre-set disposition not to decide an issue impartially," and (3) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective

United States District Court

For the Northern District of California

1   juror has a relationship to the crime itself or to someone involved
2   in a trial, or has repeatedly lied about a material fact to get on
3   the jury." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en
4   banc).

5        Petitioner is mistaken that the trial court dismissed
6   Juror Number 2 only because she failed to disclose that she had been
7   the victim of four crimes.  This nondisclosure was only one of
8   several instances in which Juror Number 2 had not been honest about
9   her background.  As stated above, she had failed to disclose that
10  she was familiar with gangs and the neighborhood in which the crime
11  occurred.  Moreover, the trial court's questioning of Juror Number 2
12  and the jury foreperson revealed that Juror Number 2 was using her
13  experiences as a witness in the jury room.  Furthermore, Juror
14  Number 2's less than candid responses to the trial court's questions
15  called her credibility and, thus, her objectivity, into question.

16       As discussed previously, the disclosure about her gang
17  experiences alone would likely have been a valid basis for a cause
18  challenge.  The facts also suggest that actual bias or implied bias
19  would apply.

20       Given that the state appellate court thoroughly analyzed
21  Juror Number 2's responses under the totality of the circumstances,
22  and the deference given to the state court's findings of fact, that
23  court's rejection of Petitioner's Sixth Amendment claim was not
24  contrary to or an unreasonable application of clearly established
25  Supreme Court authority or an unreasonable determination of the
26  facts in light of the evidence.  Habeas relief based on this claim
27  is not warranted.

28

21

**B**

Petitioner argues that he was deprived of due process of law because the evidence was insufficient to support a conviction of second degree murder based on the "natural and probable consequences" doctrine.  Petitioner argues that, although he acknowledged that he intended to join the others in the car in a group confrontation, he only intended that it involve fists and possibly the baseball bat that was found in the car, and disclaimed all knowledge of a gun.  Because the intended crime with fists or a baseball bat did not occur, Petitioner argues that there were no "natural and probable consequences" for which he can be liable.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim which, if proven, entitles him to federal habeas relief.  Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).  However, "Jackson claims face a high bar in federal habeas proceedings . . ."  Coleman v. Johnson, __ U.S. __, 132 S. Ct. 2060, 2062 (2012) (per curiam).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution,

**United States District Court**

For the Northern District of California

1    any rational trier of fact could have found the essential elements

2    of the crime beyond a reasonable doubt.'" Payne, 982 F.2d at 338

3    (quoting Jackson, 443 U.S. at 319).   Only if no rational trier of

4    fact could have found proof of guilt beyond a reasonable doubt, has

5    there been a due process violation.   Jackson, 443 U.S. at 324;

6    Payne, 982 F.2d at 338.

7         The state appellate court first reviewed the jury

8    instruction on the natural and probable consequences doctrine.   The

9    jury instruction specified:

10            One who aids and abets in the commission of a
               crime is not only guilty of that crime, but is
11            also guilty of any other crime committed by a
               principal which is a natural and probable
12            consequence of the crime originally aided and
               abetted.   Before you may decide whether the
13            defendant is guilty of the crime of second
               degree murder or voluntary manslaughter, you
14            must decide whether he is guilty of aiding and
               abetting an assault with a deadly weapon . . .

15            To prove that the defendant is guilty of second
16            degree murder or voluntary manslaughter, the
               People must prove beyond a reasonable doubt,
17            that one, the defendant knowingly and
               intentionally aided and abetted as assault with
18            a deadly weapon.   Two, during the commission of
               an assault with a deadly weapon, a co-
19            participant in that offense committed the crime
               of murder or voluntary manslaughter, and three,
20            under all of the circumstances, a reasonable
               person in the defendant's position would have
21            known that the commission of the murder or
               voluntary manslaughter was a natural and
22            probable consequence of the commission of an
               assault with a deadly weapon.

23            A co-participant in a crime is the perpetrator
24            or anyone who aided and abetted the perpetrator.
               It does not include a victim or innocent
25            bystander.   A natural and probable consequence
               is one that a reasonable person would know is
26            likely to happen if nothing unusual intervenes.
               In deciding whether a consequence is natural and
27            probable, consider all of the consequences
               established by the evidence.   If the murder or
28            voluntary manslaughter was committed by the co-

United States District Court
For the Northern District of California

1

2

3

> participant for a reason independent of the
> common plan to commit an assault, then the
> commission of murder or voluntary manslaughter
> was not a natural and probable consequence of
> the assault.

4   8 RT 1157-58.

5      The appellate court then reviewed the evidence that supported a

6 finding that Petitioner knowingly and intentionally aided and

7 abetted an assault with a deadly weapon.  The most potent evidence

8 was the testimony of the gang expert who explained that, at the time

9 of the shooting, a gang war was being waged between Sureños and

10 Norteños which included violent attacks by gang members upon rival

11 gang members and that these attacks often involved shootings.  The

12 expert testified that the ultimate goal in gang culture was to kill

13 a rival gang member.  Evidence established that Petitioner was a

14 long-time Sureño member with a violent past.  Petitioner's

15 girlfriend testified that Sureño gang members told him, shortly

16 before the shooting, that they had had an argument with Norteños.

17 They told Petitioner that they wanted to return for payback, and

18 then Petitioner got into the car with the five Sureños.  The gang

19 expert testified that gang members would take guns with them when

20 entering a rival gang's territory to retaliate.  Evidence seized

21 after the shooting showed that the car Petitioner had driven

22 contained two guns, a box of bullets, a baseball bat and a stabbing

23 shank.  Petitioner admitted he intended to attack the rival gang

24 members when he drove back to confront them.

25      The appellate court then addressed Petitioner's argument that

26 the murder was not foreseeable because he only intended to assault

27 the rival gang members with fists or a baseball bat and did not know

28

1    or intend that Josue O. would shoot Rodriguez with a gun.  The court

2    stated:

> In finding defendant guilty of second degree
> murder, the jury may well have found that
> defendant knew that Josue intended to shoot at
> Rodriguez (while lacking the specific intent to
> kill) and that Rodriguez's death was a
> foreseeable consequence of the shooting.
> Defendant told police he did not know there were
> guns in the car but the jury was free to
> disbelieve defendant on this point.  A rational
> trier of fact could conclude that the car
> occupants did know there was a gun in the car
> and planned to shoot a Norteño with the
> intention of either killing or injuring the
> victim.
>
> Even if the jury credited defendant's claimed
> ignorance of a gun--the jury could still find
> murder to be a foreseeable consequence of the
> violent gang confrontation. . . . In the context
> of a gang war, a jury could rationally conclude
> that an attack by six gang members wielding a
> baseball bat upon rival gang members could
> escalate into a fatal confrontation.
>
> The fact that the baseball bat was never actually
> used in the confrontation does not change the
> analysis.  Defendant was still properly found liable
> for the homicide as a natural and probable
> consequence of the planned gang assault.
>
> . . .
>
> Defendant asserts that "[t]here was no evidence
> from which a jury could reasonably conclude that
> if [defendant] only intended a fistfight, even a
> fight with a bat or a club, he should have
> expected that someone in his car would use a
> gun."  While the assertion may have some force
> in a common fistfight, it has no force in the
> context of the ongoing gang war.  Our Supreme
> Court has recognized that the gang-related
> nature of an assault--even one without weapons--
> may provide the trier of fact with sufficient
> evidence to conclude that 'escalation of the
> confrontation to a deadly level was reasonably
> foreseeable.'

People v. Ayala, A122412 at 11-13.

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

       The state appellate court properly applied the <u>Jackson</u> standard to the facts of Petitioner's case and found sufficient evidence to support the jury's finding that Petitioner was guilty of second degree murder through the application of the natural and probable consequences doctrine.  Under AEDPA's heightened level of deference, this Court cannot say that the state appellate court's determination was contrary to, or involved an unreasonable application of Supreme Court authority or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Therefore, this claim for habeas relief is denied.

                                    C

       Petitioner characterizes his third claim as the deprivation of his right to a jury trial on the gang-related weapon enhancement as an aider and abettor because the instruction given to the jury did not require it to find that he was a "principal" in the murder.  However, in this claim Petitioner is challenging an ambiguous jury instruction, rather than the deprivation of the right to a trial by jury.

       An allegation that a jury instruction is incorrect under state law does not form a basis for federal habeas corpus relief.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991).  In reviewing an ambiguous instruction, the appropriate inquiry is whether there was "a reasonable likelihood" that the jury applied the instruction in a way that relieved the State of its burden to prove every element of the crime beyond a reasonable doubt.  <u>Id.</u> at 72 (quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990)).  There is a reasonable likelihood that a jury's application of the challenged instruction

United States District Court

For the Northern District of California

1  violated the Constitution if its use "'so infected the entire trial

2  that the resulting conviction violates due process.'"  Id. (quoting

3  Cupp v. Naughten, 414 U.S. 141, 147 (1973)).

4       Moreover, a petitioner must show not only that there was a

5  reasonable likelihood that the jury misapplied the law in a way that

6  violated the Constitution, but also that the state court was

7  unreasonable in deciding otherwise.  Estelle, 502 U.S. at 72;

8  Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam).  The

9  instruction "must be considered in the context of the instructions

10  as a whole and the trial record."  Estelle, 502 U.S. at 67 (citing

11  Cupp, 414 U.S. at 147).

12       Petitioner's claim is based on the fact that, in order for

13  him to be subject to the aider and abettor enhancement under

14  California Penal Code § 12022.53, the jury was required to find that

15  he was a principal in the commission of the murder, but the jury was

16  instructed that it only had to find that he was "charged as a

17  principal within the meaning of Penal Code § 12022.5(e)."  He argues

18  that because the correct requirement was not submitted to the jury,

19  the jury did not make the finding that he was a principal in the

20  crime and, thus, the enhancement finding cannot stand.

21       The appellate court found Petitioner's argument to be

22  untenable.  The court explained that, under California law, a

23  consecutive twenty-five year-to-life enhancement is added to the

24  sentence if a person murders with the personal and intentional

25  discharge of a firearm, see Cal. Pen. Code § 12022.53(a)(1), (d),

26  and, if a criminal street gang is involved, all principals,

27  including the shooter and accomplices, receive the sentence

28  enhancement, see Cal. Pen. Code § 12022.53(d), (e)(1).  The

United States District Court

For the Northern District of California

appellate court acknowledged that, to be liable as an aider and abettor under California Penal Code § 12022.53(d), the defendant must be a principal in the offense, and that, in its verdict, the jury found that "the allegation that Defendant Faustino Ayala was charged as a principal in the commission of the above offense . . . to be TRUE."  The appellate court acknowledged that the language of the verdict form was "less than perfect," but found that the imperfection was minor.

The appellate court noted that the jury returned three separate verdict forms: one for the offense of murder; one for the gang-related firearm enhancement at issue here; and one for a gang participation enhancement.  The gang-related firearm enhancement verdict form contained the language at issue, that Petitioner was "charged" as a principal.  The court reasoned that, because the jury found in the first verdict form that Petitioner was guilty of murder, it necessarily found that he was a principal in the commission of murder.

Viewing the instruction at issue in the context of the instructions as a whole, there is not "a reasonable likelihood" that the jury applied the instruction in a way that relieved the State of its burden to prove every element of the crime beyond a reasonable doubt and the state appellate court's finding was not unreasonable. As noted by the appellate court, even though the jury instruction and the verdict form included the language that Petitioner was "charged" as a principal in the murder, rather than the language that Petitioner "was a principal" in the murder, the error was minor.  Because the jury separately found Petitioner guilty of

United States District Court

For the Northern District of California

1  second degree murder, it necessarily found him to be a principal in

2  the murder.

3      Petitioner next argues that he only aided and abetted an

4  assault because he lacked the required intent to aid and abet the

5  murder and, thus, the jury, if it had been required to find that he

6  was a principal in the murder, would not have been able to do so.

7  Citing People v. Prettyman, 14 Cal. 4th 248, 259 (1996), the

8  appellate court explained that, under California Penal Code § 31,

9  which provides the definition of a principal, an aider and abettor

10 of a crime is a "principal" and shares the guilt of the actual

11 perpetrator,  Citing People v. Croy, 41 Cal. 3rd 1, 15 n.5 (1985),

12 the appellate court explained that an aider and abettor is liable

13 not only for the offense he or she aids or abets, but also for any

14 other reasonably foreseeable offense committed by the person who was

15 aided and abetted.  The appellate court summed up the law as it

16 applied to Petitioner as follows:

17         In short, a principal in the commission of
           assault with a deadly weapon is a principal in
18         the commission of murder if murder was a
           reasonably foreseeable consequence of the
19         assault, as it was here.  Defendant was a
           principal in the murder and thus subject to the
20         gang-related firearm enhancement for his
           confederate's intentional and personal discharge
21         of a gun that killed Rodriguez.

22 People v. Ayala, A122412 at 32.

23     The interpretation of a state statute by the highest state

24 court is binding on federal courts.  Johnson v. Fankell, 520 U.S.

25 911, 916 (1997).  Neither the United States Supreme Court nor any

26 other federal tribunal has any authority to place a construction on

27 a state statute different from the one rendered by the highest court

28 of the state.  Id.

United States District Court
For the Northern District of California

1    The appellate court's interpretation of "principal" and

2 aiding and abetting based upon California Supreme Court authority is

3 binding on this Court and, thus, its interpretation of the

4 California statutory scheme defining "principle" and liability of an

5 aider and abetter is not contrary to or an unreasonable application

6 of Supreme Court authority.  Under this statutory scheme, because

7 Petitioner was an aider and abettor of the assault, he was liable

8 for the murder as a reasonable foreseeable consequence of the

9 assault.

10    Therefore, the appellate court's denial of Petitioner's

11 challenge to the jury instruction was not contrary to or an

12 unreasonable application of Supreme Court authority or an

13 unreasonable determination of the evidence.  Petitioner is not

14 entitled to habeas relief on this claim.

15                                V

16    For the foregoing reasons, the Petition for a Writ of

17 Habeas Corpus is DENIED.

18    Further, a Certificate of Appealability is DENIED.  See

19 Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner

20 has not made "a substantial showing of the denial of a

21 constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner

22 demonstrated that "reasonable jurists would find the district

23 court's assessment of the constitutional claims debatable or wrong."

24 Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not

25 appeal the denial of a Certificate of Appealability in this Court

26 but may seek a certificate from the Court of Appeals under Rule 22

27 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the

28 Rules Governing Section 2254 Cases.

1          The Clerk is directed to enter Judgment in favor of

2    Respondent and against Petitioner, terminate any pending motions as

3    moot and close the file.

4          IT IS SO ORDERED.

5

6    DATED    _08/06/2012_                                                    _____

7                                          THELTON E. HENDERSON
                                           United States District Judge

8

9

10   G:\PRO-SE\TEH\HC.10\Ayala-10-4375DenyHC.wpd

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California